IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

Mary Corcoran,

 Plaintiff,

v.

HCA-HealthONE LLC, d/b/a Rose Medical Center,

 Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff Mary Corcoran, through her attorneys, Diane S. King and Matthew Fredrickson, of the law firm of King & Greisen, LLP, for her Complaint and Jury Demand against HCA-HealthONE LLC, d/b/a Rose Medical Center ("Rose"), alleges as follows:

### JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States of America and the State of Colorado, including Article III, Section 1 of the United States Constitution. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331 & 1343, and 42 U.S.C. § 1988, as amended by the Civil Rights Attorney Fee Award Act of 1976.

2. This action is authorized and instituted pursuant to Title VII of the Civil

1

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"), 42 U.S.C. § 2000e-5(f)(1) and (3), and the Pregnancy Discrimination Act of 1978 ("PDA"); the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.*, ("ADA"); the Colorado Anti-Discrimination Act, C.R.S. §§ 24-34-401, *et seq.* ("CADA"), and the Colorado Pregnant Workers Fairness Act amendments to CADA, C.R.S. § 24-34-402.3; and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3), as all of the events giving rise to the claims asserted herein occurred in the District of Colorado of the United States of America.

4. All procedural prerequisites for the filing of this suit have been met. Ms. Corcoran timely filed a Charge of Discrimination alleging sex/pregnancy and disability discrimination and retaliation for engaging in protected activity against Defendant with the Colorado Civil Rights Division ("CCRD"), double filed with the Equal Employment Opportunity Commission ("EEOC").

5. The EEOC granted Ms. Corcoran a right to sue on June 4, 2021.

6. Ms. Corcoran has filed this Complaint within 90 days of receiving a Notice of Right to Sue from the EEOC.

## PARTIES

7. Plaintiff Mary Corcoran is a woman who currently is, and at all times relevant to this action has been, a citizen of the United States of America and a resident of the State of Colorado.

8. At all times during the events giving rise to this action, Ms. Corcoran was an employee employed by Rose.

9. HCA-HealthONE is a network of hospitals and clinics. Rose is one of HCA-HealthONE's medical centers. Rose is located in Denver, Colorado.

10. At all times relevant to this action, Defendant Rose has been an employer within the meaning of 42 U.S.C. § 2000e(b).

## FACTUAL ALLEGATIONS

11. Ms. Corcoran started working for Rose in October of 2015 as a Charge Nurse in the Emergency Department ("ED"). She was promoted to a Clinical Nurse Manager shortly thereafter. In June of 2018, Ms. Corcoran was promoted to Director of Emergency Services. By that time, she had been working in emergency medicine for approximately 19 years.

12. Ms. Corcoran's responsibilities as the Director of Emergency Services included supervising the ED staff; managing all department metrics; overseeing safety, quality, and the finances of the ED; managing patients' experience; and participating on various hospital committees. She reported to Chief Operating Officer ("COO") Hollie Seeley and supervised approximately 80 employees.

13. From 2015 to 2019, Ms. Corcoran continually received praise and recognition for her tremendous effort and commitment to her work. In early 2019, she received a positive performance review that indicated she was meeting all expectations, as had all her prior performance reviews at Rose.

14. In the beginning of April 2019, Ms. Corcoran learned that she was pregnant, and she was due to give birth in late November 2019.

15. Ms. Corcoran initially struggled with whether to have the baby because she was single, she was told she likely would not be able to have children due to her medical history, and she suspected that the pregnancy would be challenging given her then age (38).

16. Ms. Corcoran ultimately made the decision to carry the baby to full term and raise her on her own with the support of her family. At the end of April 2019, Ms. Corcoran informed her boss Seeley that she was pregnant. Seeley acted happy for Ms. Corcoran. Ms. Corcoran did not tell her staff at that time.

17. On May 31, 2019, Ms. Corcoran began bleeding profusely. Ms. Corcoran was concerned about going to the hospital where she worked because she had not yet announced her pregnancy to her staff. However, she ultimately went to the Rose ER because her doctors and medical records were located there, and she knew that the ER staff would take good care of her and her baby.

18. Ms. Corcoran was diagnosed with placenta previa and her doctor ordered that she be put on pelvic rest for a few days.

19. The bed rest directive came at a challenging time as Ms. Corcoran was preparing for the Quality, Review, and Safety ("QRS") survey at Rose. The QRS survey measures the quality of the hospital staff's care and ability to follow safety procedures. It is an important survey.

20. Seeley did nothing to assist Ms. Corcoran with her job responsibilities while she was on bed rest. On the contrary, she demanded the same level of productivity despite Ms. Corcoran's medical condition.

21. Ms. Corcoran's bleeding persisted for approximately two weeks after which the previa resolved.

22. After Seeley learned about Ms. Corcoran's pregnancy-related health issues, she began blaming Ms. Corcoran for issues that were not her fault.

23. For instance, in mid-March 2019, Seeley had changed the policy in the ED for bedding patients. The ED's nursing staff was unhappy with this change.

24. In early May, Ms. Corcoran received the results of the Employee Satisfaction Survey in which the nurses' expressed their displeasure with Seeley's new policy. Rather than accept responsibility for the negative survey results, Seeley blamed Ms. Corcoran in June of 2019.

25. Seeley also faulted Ms. Corcoran for not meeting with her staff prior to developing a plan to address the negative Employee Satisfaction Survey results.

26. Ms. Corcoran only had ten days to develop the plan, which was not enough time to meet with her team. That is, Ms. Corcoran's team was comprised of approximately 80 people. To meet with *all of them* to develop a plan in only ten days was not possible.

27. Ms. Corcoran consequently developed the action plan herself by the deadline and shared the results of the survey and the plan with her staff at their next

regularly scheduled meeting. She also started meeting individually with her staff to ensure she got everyone's feedback. Despite Ms. Corcoran's efforts, Seeley kept complaining that Ms. Corcoran was not doing enough to address the Employee Satisfaction Survey.

28. Similarly, in mid-July of 2019, the Assistant Director of Emergency Services at Rose was promoted to Director of Emergency Services at another HealthONE hospital. Seeley decided not to replace him.

29. As a result, Ms. Corcoran's workload doubled. She now had to oversee the offsite ER facility in addition to the main ER. Ms. Corcoran now had to work 12 to 16-hour days.

30. Ms. Corcoran and the Clinical Operations Manager complained to Seeley about the failure to replace the Director of Emergency Services and the impact it was having on their workload. Seeley claimed that it was a budgetary decision that would not be reconsidered.

31. In early September of 2019, without any notice to Ms. Corcoran, Seeley placed Ms. Corcoran on a Performance Improvement Plan ("PIP") for the first time in Ms. Corcoran's career at Rose.

32. The PIP was unfounded. It was based on the decrease in scores on the Employee Satisfaction Survey and for not sharing the results of that survey with her staff prior to developing an action plan.  The decrease in scores on the Employee Satisfaction Survey was largely due to the change to the hospital's bedding policy made by Seeley.

Likewise, Ms. Corcoran did not share the results of the survey with her staff prior to developing an action plan because Ms. Corcoran was not given sufficient time to share the results with her staff prior to developing the plan. She did, however, make significant efforts immediately developing the plan to communicate with her staff about the survey and the plan.

33. Ms. Corcoran was given a few days to identify how she would meet the goals of the PIP and how her efforts would be measured. Despite the short timeframe, Ms. Corcoran was determined to keep her job. She provided Seeley a detailed response to the PIP.

34. Seeley then informed Ms. Corcoran that she would have 30 days to demonstrate improvement with respect to the above two issues and that her progress towards the action items would be evaluated at weekly meetings with Seeley, Human Resource Officer Molly Garrison, and Assistant Chief Nursing Officer Paul Heskin.

35. Ms. Corcoran was never told that failure to complete all of the action items in her PIP would result in her termination.

36. Over the next several weeks, Seeley revised Ms. Corcoran's PIP, including the performance complaints, goals, metrics for success, and deadlines contained therein, approximately five times.

37. For instance, in early October Seeley *added to* the PIP that Ms. Corcoran had missed the August deadline for the monthly operations review ("MOR").

38. In fact, Ms. Corcoran had submitted that report before the deadline, but the

7

Senior Vice President of Business Development said that it was missing some data that had just been added to the ER data set.

39. Ms. Corcoran promptly requested the missing data from Rose's data analyst and informed the SVP of Business Development that she would provide the additional information as soon as possible, which she promptly did just two hours after the deadline. This was the only time that Ms. Corcoran "missed" a MOR deadline and, more importantly, nothing was said about the two-hour delay regarding one data set in August or in the original PIP.

40. Seeley *also added* to the later versions of the PIP that there were delays and inaccuracies in the inventory process that Ms. Corcoran oversaw.

41. This accusation was untrue. The inventory process for the ER was completed on time. The only delay was in the picking up of the form, which occurred two hours late because the lead ER tech had a family emergency that morning. Despite this minor delay in obtaining the form, the ER tech completed the inventory count accurately and by the deadline.

42. As for Seeley's accusation that there was an inaccurate count of supplies, the supply chain team that counted the inventory counted well after the tech did the count and in the interim some of the supplies were used for patients.

43. Lastly, Seeley *added* to the PIP that the ED had seen a decrease in HCAHPS scores, a score reflecting patients' satisfaction with their hospital experience, because of inconsistent nurse leadership rounding, which is inaccurate.

8

44. While there was some criticism in the patient survey that the nurse managers were not rounding enough, the scores for the ED actually *increased* from 75% when Ms. Corcoran assumed leadership of the department to 85% at the time of the HCAHPS survey. It was the hospital's other departments that experienced a decrease in their HCAHPS scores, and it was that decrease that drove down the hospital's average score on the survey.

45. As a result of adding the HCAHPS scores to Ms. Corcoran's PIP, there were discussions in her weekly PIP meetings about the appropriate number of nurse rounds on patients in the ED to check on them. More rounds, it was thought, would improve patients' experience in the ED and thereby improve the ED's HCAHPS scores. Again, the ED's HCAHPS scores did not need improving, but Seeley added this requirement to Ms. Corcoran's PIP regardless.

46. It had always been the practice in Rose's ED that the charge nurses did the majority of the rounding on patients. The charge nurses would round on approximately eight to ten patients per shift. Managers, including Ms. Corcoran and the Clinical Operations Manager, would round on only four patients per day because of their other responsibilities.

47. At the end of September 2019, Seeley determined that Ms. Corcoran's rounding responsibilities should be increased from four to six patients per day. By the beginning of October, that number increased to 18 patients per day, which took approximately three to four hours per day. At the same time, the other nurse managers,

including the Clinical Operations Manager, were absolved of all their rounding responsibilities, which was not the norm in other HealthONE EDs. The increase in only Ms. Corcoran's rounding responsibilities was designed to overwork and overwhelm her and set her up for termination.

48. Although Ms. Corcoran was in her third trimester of a difficult pregnancy, she worked hard to achieve the goals in her PIP. She worked 60 to 70-hour weeks in September and October 2019, which did not afford her much time to care for herself and her body. As a result, she was not eating or sleeping well.

49. In early October, Ms. Corcoran complained to Heskin that the increased level of rounding was not sustainable given her other responsibilities and asked for help from the Clinical Operations Manager, which Seeley and Heskin denied. Neither Ms. Corcoran nor the Clinical Operations Manager were given a reason why the Clinical Operations Manager was not permitted to help lessen Ms. Corcoran's load. The only credible explanation for not letting the Clinical Operations Manager help Ms. Corcoran with rounding is that Seeley and now Heskin wanted Ms. Corcoran to fail.

50. Sadly, on October 18, 2019, when Ms. Corcoran was working a nine-hour shift with no breaks, she started feeling sick. She checked her blood pressure, which was high. Her doctor did some testing and discovered that she was having regular contractions. He advised her to go home and rest. Ms. Corcoran notified Seeley that she needed to go home because of contractions and hypertension, and that she was unable to round that day. Seeley appeared to be sympathetic.

51. Less than one week later, however, on October 24, 2019, Ms. Corcoran was called into a meeting with Seeley, Garrison, and Heskin and terminated at eight and ½ months pregnant despite having made measurable progress towards meeting her PIP's goals, which kept changing. For example, she completed the 1:1 rounds with all the charge nurses and submitted her notes from those rounds to Seeley and Heskin. It was also announced that morning that the ED's results on the HCAHPS survey had increased to 89.9%. Seeley had even acknowledged Ms. Corcoran's progress towards meeting the PIP goals at their weekly meetings.

52. In her termination meeting, Ms. Corcoran was told generally that "this is not a sustainable 'thing' moving forward in the long term." The only specific reason she was given for her termination was that she had not met the new requirement of 18 rounds per day that was imposed on her in just the last two weeks of the PIP period (thereby giving her fewer than 30 days to demonstrate compliance). Although Ms. Corcoran had rounded extra the week after she went home sick, Seeley claimed that she was 20 rounds short for that week and three rounds short for the prior week. In other words, Ms. Corcoran was penalized for missing rounds due to pregnancy complications even though she had informed her supervisor beforehand about her need to take time off from work because of her medical condition. The shortfall in rounds was also because Ms. Corcoran's safety checks were determined not to count as rounds, which had never been explained to Ms. Corcoran before. Rose's purported reason for terminating Ms. Corcoran is not true.

53. The following day, Ms. Corcoran's placenta ruptured due to the stress of her unwarranted termination. She delivered her baby by emergency c-section at Rose a few days later. The baby was five weeks premature and was in the NICU for a few days. Ms. Corcoran brought baby Lily home later that week at 4 lbs. 11 oz.

## FIRST CLAIM FOR RELIEF
(Sex/Pregnancy Discrimination in Violation of Title VII and CADA)

54. Plaintiff hereby incorporates by reference all allegations set forth above.

55. Plaintiff was pregnant and therefore belongs to a protected class. She was highly qualified for the job she held with Rose as evidenced by her positive evaluations and her ability to meet the goals set for her in 2019. She suffered adverse employment actions based on her pregnancy, complications with her pregnancy, and related medical conditions.

56. Specifically, once Seeley and other senior managers at Rose learned that Ms. Corcoran was pregnant, they began to question whether she could or would sustain her level of performance and commitment to the hospital as a single mother of a baby.

57. After Ms. Corcoran developed pregnancy-related complications, Seeley and other senior managers feared Ms. Corcoran would miss work. They, therefore, began trying to push Ms. Corcoran out of her position by blaming her for issues that were not her responsibility or fault, overworking her, and denying her critical support.

58. Although Ms. Corcoran was able to meet the increased demands placed on her by Seeley and other senior managers, notwithstanding her pregnancy-related complications, Rose placed Ms. Corcoran on an unwarranted and ever-changing PIP.

59. Later, Rose terminated Ms. Corcoran at eight and ½ months pregnant, before she had an opportunity to meet the goals in her constantly changing PIP, citing one PIP goal she could not reasonably meet given her pregnancy and related medical issues.

60. These adverse actions were directly related to her pregnancy and pregnancy related medical issues rather than any legitimate performance issues because of the timing and circumstance of when they arose.

61. Rose's unlawful employment practices were intentional.

62. Rose engaged in this unlawful employment practice with malice or with reckless indifference to Ms. Corcoran's federal and state protected civil rights.

63. Rose's unlawful employment practices caused Ms. Corcoran great financial and emotional harm.

## SECOND CLAIM FOR RELIEF
### (Disability Discrimination in Violation of the ADA and CADA)

64. Plaintiff hereby incorporates by reference all allegations set forth above.

65. Ms. Corcoran is disabled within the meaning of the ADA and CADA because of her high-risk pregnancy and pregnancy-related complications.

66. Ms. Corcoran was and is qualified for her job at Rose because she successfully performed her duties not withstanding her pregnancy and related medical conditions.

67. Ms. Corcoran suffered multiple forms of discrimination because of her disability and/or perceived disability, including multiple adverse employment actions (e.g., placement on a PIP, retaliation, and termination).

68. Rose's unlawful treatment of Ms. Corcoran and illegal employment actions were intentional.

69. Rose engaged in this unlawful employment practice with malice or with reckless indifference to Ms. Corcoran's federal and state protected civil rights.

70. Rose's unlawful employment practices caused Ms. Corcoran great financial and emotional harm.

## THIRD CLAIM FOR RELIED
### (Retaliation for Engaging in Activity Protected by the ADA and CADA)

71. Plaintiff hereby incorporates by reference all allegations set forth above

72. Less than one week after Ms. Corcoran requested an accommodation for her pregnancy-related medical condition (i.e., to miss work and rounding for one day), Rose terminated her for not completing the onerous rounding requirements that were added to her PIP in the middle of the 30-day PIP period.

73. That is, Ms. Corcoran engaged in protected activity by requesting this accommodation.

74. A reasonable employee would have found the termination a materially adverse action.

75. A causal connection exists between Ms. Corcoran requesting the accommodation and her termination because Rose cited the rounds she missed for needing the accommodation as the reason for her termination occurring less than a week after she missed those rounds.

76. These unlawful employment practices were intentional.

77.  Rose engaged in this unlawful employment practice with malice or with reckless indifference to Ms. Corcoran's federal and state protected civil rights.

78.  Rose's unlawful employment practices caused Ms. Corcoran great financial and emotional harm.

WHEREFORE, Ms. Corcoran respectfully requests that this Court enter judgment in her favor on her claim and award the following relief to her:

Compensatory damages, including, but no limited to, those for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish and other nonpecuniary losses;

 a. Punitive damages as allowed by law in an amount to be determined at trial;

 b. Actual economic damages and consequential damages arising out of Defendant's conduct;

 c. Declaratory relief and other appropriate equitable relief;

 d. Pre-judgment and post-judgment interest at the highest lawful rate;

 e. Reasonable attorney's fees and costs, including expert witness costs, as otherwise allowed by law;

 f. Any and all relief as allowed by law or as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 2nd day of September 2021.

King & Greisen, LLP

*/s/ Diane S. King*

Diane S. King, #16925

Matthew Fredrickson, #47453
1670 York Street
Denver, Colorado 80206
Telephone: (303) 298-9878
Fax: (303) 298-9879

Plaintiff's Address:

1335 Uinta Street
Denver, CO 80220